ANDREW M. DUPAY, Respondent, v. FRANK J. GALBINA, Appellant.

First Department, April 8, 1921.

Conversion — government bonds bought with partnership money and turned over to partner — scheme of partners to protect one member's interests — verdict against weight of evidence.

In an action to recover damages for the alleged conversion of government bonds a verdict in favor of the plaintiff is overwhelmingly against the weight of the evidence, where the defendant claims the bonds as his own property, representing his share of the profits in the partnership funds

received at a time when there existed between the partners a scheme to hide the defendant's interest in the partnership property by the issuance to plaintiff of partnership notes for the amount of the undistributed profits of the partnership, and that at the time the bonds were bought they were turned over to the defendant, and that in making a statement to a bank plaintiff made no mention of the bonds while the defendant listed them as his own personal property and regularly deposited the coupons therefrom in his individual account, except in two instances when he gave them to the plaintiff to adjust a special loan.

APPEAL by the defendant, Frank J. Galbina, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 14th day of June, 1919, on the verdict of a jury for $21,006.80, and also from an order entered in said clerk's office on the 24th day of June, 1919, denying defendant's motion to set aside the verdict and for a new trial made upon the minutes.

*Sydney A. Syme* of counsel [*William D. Sporberg*, attorney], for the appellant.

*Frederick N. Van Zandt* of counsel [*Richard H. McIntyre* with him on the brief; *Harris & Towne*, attorneys], for the respondent.

GREENBAUM, J.:

This action which has been pending since 1913 was brought for the alleged conversion by defendant of fifteen United States government three per cent coupon bonds of the par value of $1,000 each, which the plaintiff alleges were delivered for safekeeping to defendant in June, 1904.

The action was first tried in April, 1915, and resulted in a disagreement of the jury. The second trial was brought on during June, 1919, more than four years after the first trial, after defendant had moved to dismiss the action for failure to prosecute. (*Dupay* v. *Galbina*, 186 App. Div. 888.)

In 1896 plaintiff and defendant entered into a partnership in which they had equal interests, in the business of manufacturing artificial flowers, in New York city. The partnership was dissolved on July 1, 1913. The original amount of capital with which the firm started in business was $5,000, each partner contributing $2,500. It is agreed that the

business prospered and increased in volume from year to year, showing a substantial profit each year, with the exception of the fiscal year ending June 30, 1901, when there was a loss of $695.51, and that at the end of the fiscal year terminating June 30, 1903, there were assets on hand to the amount of $57,386.55 and no liabilities. Part of these assets consisted of money in bank, to the amount of $33,157.03.

On July 7, 1903, $10,000 was transferred from the old bank account to a new bank account in the Corn Exchange Bank, Astor Place Branch; and thereafter an additional sum of $32,578.18 was transferred to the new bank account.

It is not disputed that in the latter part of 1903 and in February, 1904, three notes aggregating $32,578.18 were executed by the firm and delivered to the plaintiff and when due were paid out of the firm's new account. The plaintiff claimed that these notes were given as representing his share of the accumulated profits of the business up to June 30, 1903.

Defendant testified that he had a half interest in the notes in question, which were executed under the following circumstances: Some time prior to 1902 defendant met a woman in Italy named Valmorra with whom he had illicit relations as a result of which she claimed to have been delivered of a child by him. About November, 1902, the Valmorra woman had come from Italy to New York, and demanded money from him. He told plaintiff of his dilemma, and in about May, 1903, they discussed the demands of this woman at a time when the partnership had undivided liquid assets, as profits on hand amounting to $33,157.03 and that the plaintiff then said: " This woman may come over and cause you trouble, and in the courts of America, they come out victorious as a rule; I think it would be well for us to change our mode of having so much cash, as we have and open up a new set of books," and that plaintiff further said to defendant: " It would be best for us to open a new set of books, let us diminish our capital and start it with a nominal capital of, say, $10,000, and the stock and fixtures." The remainder of the undivided balance to be left in the old account until all outstanding accounts were in, and then to be divided between the two partners. Plaintiff denies that these conversations took place.

As matter of fact, however, at the end of the fiscal year July 1, 1903, the old books were closed, and a new set of books opened, with a capital of $10,000, and a new firm bank account was opened. The deposit for the new account was provided for by transferring $10,000 from the old firm bank account and crediting it on the new set of books so as to apportion $5,000 to each of the partners as contributions to capital.

Defendant also testified that when the firm notes were executed to plaintiff, he, in turn, executed and delivered to defendant his own personal notes payable to defendant personally for one-half of the amount of the firm notes made to plaintiff's order so as to protect defendant. This plaintiff denied. The moneys deposited in the new bank account to pay the notes made to plaintiff's order were entered on the books as cash loaned to the firm by plaintiff.

The three notes subsequently were paid by checks drawn on the firm's bank account, aggregating with accrued interest the sum of $33,479.75.

The first of these three notes amounting to $10,000 payable May thirteenth was paid by the partnership. Plaintiff thereupon purchased $5,000 worth of bonds through the Astor Place Bank. When notified that the bonds were ready for delivery, both plaintff and defendant went to the bank together, and plaintiff drew against a new bank account which he had opened his personal check for the sum of $5,321.88, which included accrued interest in payment of the bonds, which were then delivered to him.

At this point the parties differ as to what happened. Plaintiff claimed that he took the bonds to the office and put them in the partnership safe and that a few days thereafter he delivered them to defendant for safekeeping on the eve of his going to Europe.

Defendant insisted that when plaintiff obtained the bonds they were immediately turned over to defendant and put in a safe deposit vault box, which he specially leased for the purpose. Defendant had never before leased a safe deposit box and the documentary proof establishes that this box was hired June 3, 1904.

Defendant also testified that upon the delivery of the

bonds to him he surrendered to plaintiff one of the promissory notes for $5,000 which had previously been executed by plaintiff in his favor. It is to be observed that the bonds purchased amounted approximately to one-half of the money received by plaintiff from the firm's bank account in exchange for the note of $10,000.

The remaining notes aggregating upwards of $22,000 were paid at practically the same time in June, 1904. Additional government bonds of the par value of $10,000 were thereupon purchased under circumstances similar to those under which the $5,000 bonds were purchased and were delivered to defendant, who placed them in his safe deposit box and defendant testified that he surrendered to the plaintiff the balance of his notes.

Plaintiff testified that up to 1903 he had not withdrawn any of the accrued profits of the business, but that Galbina had withdrawn " almost all of his profits."

The testimony is most contradictory. In order, therefore, to determine what the truth is in respect of the crucial question in the case — the ownership of the bonds — it is important to consider the undisputed evidence.

The books of entry of the partnership were not produced upon the trial, excepting the firm's journal which covered the period from 1896 to December, 1905. Plaintiff concedes that the journal was correctly kept and that at the end of each fiscal year of the firm's existence from 1896 down to July 1, 1903, the net profits or losses of the firm's business were entered therein.

From these records it appears that the aggregate of the profits up to July 1, 1903, after deducting a loss during the fiscal year ending June 30, 1901, was the sum of $61,537, in which each of the parties had an equal one-half interest.

In 1904 it was ascertained that there was a loss of $5,291.72, so that the accumulated profits from 1896 to July 1, 1903, were reduced to $56,245.28 (the difference between $61,537 and $5,291.72). If that be so, there seems to be no escape from the conclusion that the defendant under no circumstances could have withdrawn $32,000, or more, as his one-half share of the profits or any sum approaching that amount for the following reasons:

On July 1, 1903, the firm concededly had assets on hand as follows:

| | |
|---|---:|
| Material and fixtures......................... | $1,791 74 |
| Merchandise stock........................... | 8,290 65 |
| Cash in bank............................... | 33,157 03 |
| Outstanding unpaid accounts subsequently collected................................. | 14,147 13 |
| Making an aggregate of assets of.......... | $57,386 55 |

There were no liabilities.

If we deduct the $5,000 capital investment of the parties, the balance of $52,386.55 would represent the accumulated profits from the beginning of the firm up to July 1, 1903, which were still in the business. The question naturally suggests itself, how would it have been possible for the defendant to have withdrawn $32,000 or any considerable portion of his one-half share of the profits prior to July 1, 1903, if the business on that date showed that there was upwards of $52,000 of profits not yet distributed.

Moreover, since the books show that the actual aggregate profits up to July 1, 1903, were $56,245.28 and that the assets on hand on that date in excess of the capital invested by both parties amounted to $52,386.55, it follows that the difference between these two items, to wit, $3,858.73, was the total amount withdrawn from the aggregate profits up to July 1, 1903, and that that sum was the maximum amount that defendant could possibly have withdrawn, assuming that plaintiff had not withdrawn any of these profits.

Stating the matter differently, if as plaintiff claimed the defendant had withdrawn upwards of $30,000 profits, it would be a physical impossibility to account for the existence of assets over and above the capital, without any liabilities, of upwards of $52,000 on July 1, 1903.

The record facts thus disclosed can lead to but one conclusion and that is that the firm notes amounting to upwards of $32,000 given to plaintiff were not given to plaintiff as representing his share of the profits then coming to him, but were intended to cover up the profits of the defendant for some reason or other, probably on account of the Valmorra

woman's pursuit of him, upon the understanding that one-half thereof was confidentially held by plaintiff for the benefit of defendant. This result harmonizes with what subsequently followed.

The amount of each purchase of bonds was approximately one-half of the amount received when the firm's notes were paid to plaintiff. When purchased they were turned over to the defendant, who promptly leased a safe deposit box in his own name for the safekeeping of the bonds; that the bonds have been in the continuous possession of the defendant up to the present time; that the parties continued their partnership for about ten years after the purchase of the bonds without any request or demand of any kind having been made by the plaintiff for their return.

In addition to these significant facts it appears that in 1902 the partnership of Dupay & Galbina signed written statements for the bank as to the financial status of the firm and of the individual members thereof. In the enumeration of his personal assets, plaintiff listed shares which he owned in various corporations as also cash and moneys owing to him on loans made without reference to the bonds in suit. We find moreover that the statement made at the same time by defendant described $15,000 United States three per cent bonds as his personal assets.

It further appears that defendant regularly deposited the coupons attached to the United States bonds in question in his individual bank from 1904 to 1913, excepting in two instances when he cut off two coupons amounting to ninety dollars, which he gave to plaintiff to adjust a matter of a special loan between them.

It follows that the verdict in favor of the plaintiff is overwhelmingly contrary to the preponderance of the credible evidence in favor of the defendant and that the verdict must be set aside and the judgment and order reversed and a new trial ordered, with costs to appellant to abide the event.

DOWLING, LAUGHLIN, SMITH and MERRELL, JJ., concur.

Judgment and order reversed and new trial ordered, with costs to appellant to abide event.